# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT GREENEVILLE

| | | |
|---|---|---|
| BOARD OF TRUSTEES, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Case No. 2:22-cv-59 |
| v. | ) | |
| | ) | Judge Atchley |
| H2OPRUF, LLC, | ) | |
| | ) | Magistrate Judge Wyrick |
| *Defendant.* | ) | |
| | ) | |

## <u>TRIAL OPINION</u>

This matter came before the Court for a bench trial on May 20, 2025. Plaintiffs assert that Defendant breached its contractual obligations to them, resulting in damages. Upon consideration of the evidence presented at trial, the Court finds for Defendant and concludes that this matter must be **DISMISSED WITH PREJUDICE**.

## I.  PROCEDURAL BACKGROUND

Plaintiffs are the Boards of Trustees for the National Roofing Industry Pension Fund ("Pension Fund") and the Roofers and Waterproofers Research and Education Joint Trust Fund ("Education Fund"). They filed suit against Defendant H2OPruf, LLC on May 24, 2022, generally alleging that H2OPruf failed to properly contribute to their multiemployer benefits funds from 2016 through 2021. [Doc. 1]. The Trustees later filed an amended complaint which brought the same claims. [Doc. 10].

On March 26, 2024, the Trustees and H2OPruf each moved for summary judgment. [Docs. 52, 54]. H2OPruf simultaneously filed a motion to dismiss or, in the alternative, for judgment on the pleadings. [Doc. 53]. The Court denied this motion. [Doc. 83]. As for the motions for summary

judgment, both were granted in part and denied in part. [Doc. 84]. Specifically, the Court found the following:

1. From January 1, 2016, through June 30, 2017, H2OPruf was obligated to contribute to the Pension Fund in accordance with the terms of both the January 1, 2016, through December 31, 2017, collective bargaining agreement ("CBA") between it and its local union[1] and the Participation Agreement between it and the Pension Fund.[2] H2OPruf was not obligated to contribute to the Education Fund pursuant to either of these contracts.

2. From July 1, 2017, through December 31, 2018, H2OPruf was obligated to contribute to the Pension Fund in accordance with the terms of both the July 1, 2017, through December 31, 2018, CBA between it and its local union[3] and the Participation Agreement between it and the Pension Fund. H2OPruf was not obligated to contribute to the Education Fund pursuant to either of these contracts.

3. From January 1, 2020, through December 31, 2021, H2OPruf was obligated to contribute to both the Pension Fund and the Education Fund in accordance with the terms of the January 1, 2020, through December 31, 2021, CBA between it and its local union.[4]

[*Id.* at 19–20]. With these findings, there were only three issues left for trial:

1. Whether H2OPruf was under a CBA and therefore obligated to contribute to either the Pension Fund or the Education Fund in 2019;

---

[1] This CBA was the parties' Joint Exhibit 2 at trial.

[2] This Participation Agreement was the parties' Joint Exhibit 63 at trial.

[3] This CBA was the parties' Joint Exhibit 7 at trial.

[4] This CBA was the parties' Joint Exhibit 20 at trial.

2

2.  Whether H2OPruf was obligated to contribute to the Pension Fund pursuant to a Participation Agreement in 2020 and 2021; and

3.  Whether H2OPruf met its contribution obligations.

[*Id.* at 20].

The Court held a final pretrial conference on May 12, 2025. [Doc. 107]. Pursuant to a Second Revised Agreed Final Pretrial Order, the parties identified the cause of action in this case as breach of contract. [Doc. 113 at 1–2]. The Court conducted a bench trial on May 20, 2025. [Doc. 115]. At the beginning of trial, the Trustees conceded that H2OPruf was not obligated to contribute to the Education Fund in 2019, narrowing the first trial issue identified by the Court to whether H2OPruf was obligated to contribute to the Pension Fund in 2019. [Trans. at 9–10].

After the Trustees rested their proof, H2OPruf stated that it would not be putting on any proof of its own. [*Id.* at 215]. H2OPruf then moved for involuntary dismissal based on insufficiency of the evidence. [*Id.* at 216]. The Court construes this as a motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). The Court heard argument from the parties and took the motion under advisement. The motion remains pending.

## II.    FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact.

### A.  Stipulations

The parties stipulated to the following facts:

1.  Exhibit 3, attached to Plaintiffs' Amended Complaint (a CBA for the period of January 1, 2016, to December 31, 2019) is not signed by either the Union or the Defendant. Both parties possessed copies of the document.

3

2. Cathy S. Adams, President of defendant, signed a Participation Agreement with the Trustees of the Pension Plan on January 1, 2016.

3. Cathy S. Adams, President of defendant, signed a CBA with the United Union of Roofers, Waterproofers, and Allied Workers, Local No. 136A, for the period from January 1, 2016, until December 31, 2017.

4. Wesley Adams, Vice President of defendant, signed a CBA with the United Union of Roofers, Waterproofers, and Allied Workers, Local No. 136A, for the period of July 1, 2017, until December 31, 2018, on July 1, 2017.

5. Wesley Adams, Vice President of defendant, signed a Participation Agreement with the Trustees of the Pension Plan on January 17, 2019.

6. Wesley Adams, Vice President of defendant, and Michael Steins, a Trustee for the union, signed a CBA with the United Union of Roofers, Waterproofers, and Allied Workers, Local No. 136A, for the period of January 1, 2020, until December 31, 2021, on January 1, 2020. Michael Steins signed as Trustee for the union.

7. Defendant collected union dues and remitted some pension contributions and research funds during the year of 2019.

8. Plaintiffs had a professional compliance audit performed for the period of January 1, 2016, through December 31, 2021.

9. Plaintiffs' audit alleges deficiencies and funds owed to both Plaintiffs.

10. Plaintiffs claim amounts owed for the Research and Education Trust Fund for years 2020 and 2021.

11. The Research and Education Trust Fund was first included in the Collective Bargaining Agreement dated January 1, 2020, until December 31, 2021.

4

12. Defendant sought and accepted work as a union contractor during the period of January 1, 2016, until December 31, 2021.

13. Defendant collected union dues from some of its employees during the period of January 1, 2016, until December 31, 2021.

Based on the parties' stipulations and the Court's review of the record, these stipulations are accepted and incorporated as findings of fact.

## B. Other Findings of Fact

The Court also makes the findings of fact below. These findings are divided into two subsections. The first subsection addresses the Court's general findings while the second specifically addresses the Court's findings regarding H2OPruf's contributions to the Pension and Education Funds and the Trustees' audit thereof. Citation is made to the certified copy of the trial transcript and exhibits introduced at trial.

### 1. General Findings

H2OPruf executed both its first CBA with the United Union of Roofers, Waterproofers, and Allied Workers, Local No. 136A and its Participation Agreement with the Pension Fund in January 2016. [Joint Exs. 2, 63]. As the Court noted in its Memorandum Opinion and Order addressing the parties' summary judgment motions ("Summary Judgment Order"), this CBA remained in effect until H2OPruf executed a second CBA with Local No. 136A on July 1, 2017. [Doc. 84 at 11; Joint Ex. 7]. This second CBA was set to expire on December 31, 2018. [Joint. Ex. 7]. As this date approached, H2OPruf neither sent written notice indicating its intent to terminate the second CBA nor otherwise indicated that it no longer wanted to affiliate with Local No. 136A. [*See* Trans. at 32–33, 197–98].

5

To the contrary, H2OPruf attempted to negotiate a new CBA with Local No. 136A throughout 2019 and manifested an intent to be bound by the second CBA until a new contract was executed. The parties' stipulations and evidence introduced at trial demonstrate that throughout 2019, H2OPruf (i) negotiated with Local No. 136A,[5] (ii) continued to withhold union dues from its employees' paychecks, (iii) continued contribute to the Pension Fund, and (iv) continued to seek and accept work as a union contractor. [Trans. at 200–03; Joint Ex. 3 at 4; Joint Ex. 4 at 2–3; Joint Ex. 31 at 2–3; Joint Exs. 51, 54, and 61]. At the same time, no evidence was introduced suggesting that Local No. 136A refused to accept the withheld union dues, admonished H2OPruf for seeking work as a union contractor while not under a CBA, or otherwise acted as if the parties' relationship had terminated. Considering the foregoing, the Court finds that H2OPruf attempted to negotiate a new CBA with Local No. 136A from the stated expiration date of the second CBA on December 31, 2018, until H2OPruf executed its third CBA with Local No. 136A on January 1, 2020. The Court further finds that H2OPruf and Local No. 136A agreed to extend the second CBA until they reached an agreement regarding a third CBA (i.e., the CBA that took effect on January 1, 2020). When this third CBA ended on December 31, 2021, so too did H2OPruf's relationship with Local No. 136A.

## 2. *Findings Regarding H2OPruf's Contributions and the Trustees' Audit*

After H2OPruf executed the first CBA and the Participation Agreement in 2016, it began remitting contributions to both the Pension Fund and Education Fund. [*E.g.*, Joint. Exs. 3, 56]. These contributions, however, were often flagged as either underpayments or overpayments due

---

[5] Wesley Adams testified that these negotiations were short-lived. [Trans. at 198–200]. The Court, however, does not find Mr. Adams's testimony credible on this point given the multitude of evidence introduced at trial—and the parties' stipulations—confirming that H2OPruf had an ongoing relationship with Local No. 136A throughout 2019. This conclusion is further bolstered by the fact that a new CBA was eventually reached in 2020. [*See* Joint Ex. 20].

to confusion regarding H2OPruf's applicable contribution rate[6] and the fact that H2OPruf calculated its contribution requirements on a payroll basis while the Pension and Education Funds calculated those same requirements on a monthly basis. [*E.g.*, Trans. at 91–96, 153–54; Joint Exs. 6, 8, 11–12]. By February 2019, these issues had become so common that H2OPruf was selected for an audit to ensure that it was meeting its contribution obligations.[7] [Joint Ex. 25]. Legacy Professionals, LLP, an independent accounting firm, was retained to perform the audit. [*Id.*].

Raidel Gamboa, a senior compliance auditor with Legacy Professionals, reached out to H2OPruf in July 2019 to obtain relevant records for the audit.[8] [Joint Ex. 24]. This process took longer than anticipated with Gamboa receiving the first set of documents from H2OPruf in 2020 and the bulk of the remaining documents in 2022.[9] [Trans at 149–51; Joint Ex. 15]. Gamboa never received certain invoices and federal income tax information from H2OPruf but was nevertheless able to prepare a formal audit report. [Trans. at 151]. This report initially calculated H2OPruf's outstanding contribution obligations to be $106,800.01, plus $10,680.00 in liquidated damages and $52,520.45[10] in interest for a grand total of $170,000.46.  [Joint Ex. 30 at 5]. After the Court issued its Summary Judgment Order, however, Gamboa revised his calculations to reflect: (i) the

---

[6] For example, the Wilson-McShane Corporation (a third-party administrator retained by the Pension and Education Funds [Trans. at 67]) sent H2OPruf three "Notices of Debit" in 2018 stating that H2OPruf was obligated to contribute to the Pension Fund at a rate of $1.25 per hour even though the applicable rate listed in the then-operative CBA was $1.00 per hour. [Joint Ex. 7 at 9 (stating the applicable contribution rate); Joint Ex. 11 at 1–3 (utilizing an incorrect contribution rate)]. The Pension and Education Funds eventually identified this error and adjusted their calculations but maintained that H2OPruf was still not meeting its contribution obligations even under the revised rates. [Joint Ex. 21].

[7] This audit was originally for the period of March 1, 2013, through March 31, 2018, [Joint Ex. 24] but morphed over the years to cover January 1, 2016, through December 31, 2021 (i.e., the period at issue in this litigation). [Joint Ex. 30].

[8] H2OPruf stipulated to Gamboa's qualifications as an auditor, which are detailed in his curriculum vitae [Joint Ex. 37], at trial. [Trans. at 147].

[9] H2OPruf attributes part of this delay to the fact that many of its accounting records were kept off-site by its accountant, Shawn Spoone. [Trans. at 123–24].

[10] $51,019.15 in Pension Fund interest plus $ 1,501.30 in Education Fund interest. [Joint Ex. 30 at 5].

7

Court's determination that H2OPruf was not obligated to contribute to the Education Fund from 2016 through 2018; (ii) the Trustees' concession that H2OPruf was not obligated to contribute to the Education Fund in 2019; and (iii) the additional interest that accumulated since the audit report was prepared. [Trans. at 163–64; Joint Ex. 68]. These revised calculations put H2OPruf's outstanding contribution obligations at $104,843.12, liquidated damages at $10,484.31, and interest at $79,658.77[11] for a grand total of $194,986.20. [Joint Ex. 68 at 2]. It is this final figure that the Trustees seek to recover from H2OPruf. The Court, however, does not find either the audit report or its revised calculations reliable, nor does the Court find Gamboa's testimony concerning the audit's accuracy credible.

Gamboa testified that he reviewed "two CBAs and a participation agreement" for the audit. [Trans. at 166]. The first CBA he reviewed covered the period from January 1, 2016, through December 31, 2019. [*Id.*]. Gamboa could not recall the second CBA he reviewed, testifying only that the CBAs he reviewed covered the audit period. [*Id.* at 166–69]. This testimony raises two red flags as the factual findings above and the Court's Summary Judgment Order make clear. First, H2OPruf never entered into a CBA with Local No. 136A covering the period from January 1, 2016, through December 31, 2019. Second, H2OPruf was a party to three CBAs during the audit period, not two. Accordingly, the Court finds that Gamboa based the audit on incomplete and inaccurate information. This calls into question whether the audit properly classified employees, whether it utilized the correct contribution rates as a result, and whether it accurately identified the hours for which H2OPruf was contractually obligated to contribute. This, however, is not the only issue with the audit.

---

[11] $78,906.98 in Pension Fund interest plus $ 751.79 in Education Fund interest. [Joint Ex. 68 at 2].

As has previously been noted, the audit initially assessed H2OPruf with delinquent contributions to the Education Fund from 2016 through 2018. [Joint Ex. 30 at 5]. And while Gamboa revised his calculations to exclude these assessments following the Court's determination that H2OPruf was not obligated to contribute to the Education Fund during these years [Trans. at 163–64; Joint Ex. 68], he never explained why these assessments were included in the audit in the first instance. The Court finds this troubling because its conclusion that H2OPruf was not obligated to contribute to the Education Fund from 2016 through 2018 was not based on a complex legal theory or an in-depth interpretation of ambiguous contractual language. Rather, it was based on the simple fact that the applicable CBAs and Participation Agreement did not mention the Education Fund at all. [*See* Doc. 84 at 10, 12, 15–16; Joint Exs. 2, 7, 63]. And with no mention of the Education Fund in the applicable contracts, it is unclear to the Court what Gamboa relied on when deciding that H2OPruf owed delinquent Education Fund contributions from 2016 through 2018. The Court appreciates that Gamboa revised his calculations after the Court's Summary Judgment Order, but that he initially assessed H2OPruf with delinquent contributions that seemingly have no basis makes the Court question the audit report's reliability, especially since the Court has identified another similar error on its own.

The audit report—even after Gamboa's revised calculations—claims that H2OPruf failed to adequately contribute to the Education Fund on behalf of non-represented employees (i.e., those employees who were not members of a union) in 2020 and 2021. [Joint Ex. 30 at 8–10; Joint Ex. 68]. But as discussed in the Court's Conclusions of Law, H2OPruf was not obligated to contribute to the Education Fund on behalf of its non-represented employees because those employees' contributions were governed by the Participation Agreement rather than a CBA, and the

Participation Agreement does not mention the Education Fund.[12] *See infra* Part IV; [*see also* Joint Ex. 63]. This then is a second instance where the audit report assesses H2OPruf with delinquent contributions even though there is no basis for the assessment.[13]

Beyond these baseless assessments, there is also the issue of whether the audit report properly credits H2OPruf for each dollar it paid to the Pension and Education Funds. Gamboa testified at trial that the audit report gives H2OPruf credit for everything it paid. [Trans. at 160, 164–65]. The Court, however, doubts this statement. When asked how H2OPruf was credited for the contributions it made, Gamboa testified that every amount listed in parentheses in the audit report is a credit. [*Id.* at 176]. The audit report itself did not total these credits [*see* Joint Ex. 30]

---

[12] The Trustees appear to acknowledge this, arguing in their Proposed Findings of Fact and Conclusions of Law that "H2OPruf was obligated to contributed [sic.] to the Pension Fund for non-represented employees during year 2020-21" but not that H2OPruf was similarly obligated to contribute to the Education Fund. [Doc. 121 at 18]. It is unclear why the Trustees would seemingly acknowledge that H2OPruf was not obligated to contribute to the Education Fund on behalf of non-represented employees in 2020 and 2021 yet still seek such contributions.

[13] Some of these baseless Education Fund assessments suffer from a second defect; they assess delinquent contributions for hours that the audit report acknowledges were not actually worked. To illustrate this point, consider the following entries pulled from the audit report (irrelevant columns have been omitted to save space):

| Last Name, First | Error Code | Hours Reported | Hours Worked | Hours Due | Month of Error | Pension Rate | Pension Due | Education Rate | Education Due | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|
| Wells, T | D | 160 | 141.00 | (19.00) | Jun-20 | 1.25 | (23.75) | | | (23.75) |
| Wells, T | H | | 160.00 | 160.00 | Jun-20 | | | .06 | 9.60 | 9.60 |

[Joint Ex. 30 at 83]. The audit report uses error code "D" to refer to instances where it believes H2OPruf has overreported the number of hours worked by a non-represented employee in a month. [*Id.*]. As for error code "H," it refers to instances where the audit report believes H2OPruf has failed to contribute to the Education Fund for hours worked by either a represented or non-represented employee. [*Id.*].

Keeping these error codes in mind, the above excerpt claims that although H2OPruf reported Wells as working 160 hours in June 2020, she actually only worked 141 hours that month. The audit report therefore credits H2OPruf $23.75 (i.e., the amount it paid the Pension Fund for the overreported nineteen hours). But the audit report then inexplicably assesses H2OPruf with delinquent Education Fund contributions for the entire 160 hours reported even though it acknowledges that Wells did not work 160 hours in June 2020. Beyond this example, the Court was able to identify multiple other instances where the audit report assesses H2OPruf with delinquent Education Fund contributions based on overreported hours as opposed to the hours actually worked by a non-represented employee. [*Id.* at 70, 83–84]. Thus, even if H2OPruf was required to contribute to the Education Fund on behalf of its non-represented employees (which for the reasons stated herein it was not), the audit report's calculations would still be inaccurate. This further undermines the audit report's reliability.

but the Court has been able to do so in the time following trial. Based on the Court's rough calculations, the audit report credits H2OPruf for approximately $12,000.00 based on the amounts listed in parentheses. [*See id.*]. While performing these calculations, the Court noticed that Gamboa was selling the audit report short regarding the credit it afforded H2OPruf. In addition to the amounts listed in parentheses, the audit report also credits H2OPruf when assessing delinquent contributions based on the claimed underreporting of hours worked by non-represented employees.[14] In these circumstances, which are coded with the "C" error code, H2OPruf is assessed delinquent contributions for the hours it allegedly failed to report but not for its reported hours.[15] [*E.g.*, *id.* at 7]. In other words, the audit report credits H2OPruf with meeting its contribution obligations for the reported hours. Accordingly, the Court can determine what amount the audit report credits H2OPruf with contributing besides the roughly $12,000.00 listed in parentheses by multiplying the reported hours in error code "C" rows by the applicable contribution rate. Performing this calculation, the Court approximates that the audit report credits H2OPruf with an additional roughly $20,000.00 in contributions besides the $12,000.00 listed in parentheses. As a result, the Court finds that the audit credits H2OPruf for roughly $32,000.00 in contributions.

This is a significant sum, but it is far less than the amount that the evidence shows H2OPruf paid. At trial, H2OPruf introduced multiple checks establishing that it paid the Pension and

---

[14] Credits relating to the underreporting of hours worked by represented employees, on the other hand, are already included in the audit report's parentheses credits. The audit report claims that where H2OPruf reported these hours and contributed for them, it did so at an incorrect rate. [*E.g.*, Joint Ex. 30 at 15 (May 2018 entries for Boggs, B)]. The audit report therefore credits H2OPruf with paying these "incorrect" contributions by listing them in parentheses before then calculating the amount it contends H2OPruf should have contributed.

[15] For example, the audit report claims that C. Adams worked 173 hours in November 2018 but that H2OPruf only reported her working 160 hours. [Joint. Ex. 30 at 7]. It therefore assesses H2OPruf with delinquent contributions for the unreported 13 hours but does not assess H2OPruf any delinquent contributions regarding the 160 hours that were reported. [*Id.*].

Education Funds $71,409.50 between 2020 and 2021.[16] [Joint Ex. 56]. Beyond this, two "Summary of Hours and Contributions" reports established that H2OPruf paid an additional $15,360.00 to the Pension Fund between 2016 and 2019.[17] [Joint Exs. 4, 31]. Finally, H2OPruf introduced evidence at trial suggesting that it paid the Funds an additional $41,115.66.[18] [Joint Ex. 56 at 1; Trans. at 212–13]. This final evidence is less probative of H2OPruf's contribution history, but it nevertheless supports the proposition that H2OPruf was contributing to the Funds. And in any event, even if H2OPruf only contributed the $86,769.50 that the Court finds it did pay, that is still more than double the roughly $32,000.00 that the audit report credits H2OPruf for. Given the size of this discrepancy and Gamboa's limited testimony concerning how H2OPruf's contributions were credited in the audit report, the Court does not find Gamboa's claim that the audit report credits H2OPruf for every dollar it contributed credible.

In conclusion, the Court finds that the audit report was based on inaccurate and incomplete information as Gamboa failed to review all the applicable CBAs when preparing it. The Court further finds that the audit report and its revised calculations assess delinquent Education Fund contributions that have no basis for being assessed. And finally, the Court finds that Gamboa's

---

[16] The Pension and Education Funds performed joint collections. [*See, e.g.*, Joint Exs. 6, 8; Joint Ex. 34 at 2–3]. Accordingly, the Court finds that all checks made out by H2OPruf to the "National Roofing Industry Pension Plan" or "NRIPP" represent contributions to both Funds. This conclusion is bolstered by the fact that the Funds' collections attorney, Robert A. Bohrer, requested that H2OPruf pay its allegedly delinquent contributions to both Funds by sending checks "payable to the NRIPP." [Joint Ex. 6 at 1; Joint Ex. 8 at 1, 5–7].

[17] These summaries show that H2OPruf contributed to the Pension Fund (based on an assumption of 160 working hours per month per employee) on behalf of Cathy and Wesley Adams from January 2016 through November 2020. [Joint Exs. 4, 31]. A third summary shows that additional contributions were made on behalf of Cathy Adams from December 2020 through April 2021. [Joint Ex. 27]. To arrive at the $15,360.00 figure above, the Court looked to only those contributions made on the Adams' behalf between 2016 and 2019. The Court finds that the summaries' remaining contributions (i.e., $5,560.00 in contributions for 2020 and 2021) are already accounted for in the $71,409.50 that H2OPruf's checks demonstrate it contributed.

[18] This figure represents the $47,675.66 that Joint Exhibit 56 states H2OPruf paid between 2016 and 2019 plus the $8,800.00 Wesley Adams testified H2OPruf paid in addition to all other amounts, minus the $15,360.00 the Court has already found H2OPruf contributed between 2016 and 2019.

12

assertion that the audit report credits H2OPruf for every dollar it paid is not credible given that the credits the Court was able to identify amount to less than half of what H2OPruf has been proven to have paid. Accordingly, the Court affords neither the audit report (including its revised calculations) nor Gamboa's testimony concerning its accuracy any meaningful weight.

### III.    APPLICABLE LAW

An employer is generally prohibited "from contributing funds to various employee representatives[]" so as "'to prevent the misappropriation and dissipation of monies due the workers by union officials.'" *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 459 (6th Cir. 1989) (quoting *Merrimen v. Paul F. Rost Elec., Inc.*, 861 F.2d 135, 137 (6th Cir. 1988)). This prohibition, however, is not absolute. An employer may contribute to a trust fund established for the benefit of employees, their families, and/or their dependents provided that certain conditions are met and that "the detailed basis on which such payments are to be made is specified in a written agreement with the employer[.]" 29 U.S.C. § 186(c)(5). This written agreement does not have to take any particular form "as long as it sets out the employer's obligation to contribute." *Cent. States, Se. & Sw. Areas Pension Fund*, 883 F.2d at 459 (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1111 n. 16 (6th Cir. 1986)). Furthermore, when this agreement takes the form of a CBA, it can continue to bind an employer beyond its stated duration provided that the parties to the CBA manifest an intent to continue being bound by its terms. *Mich. Bricklayers & Allied Craftsmen Health Care Fund v. Nw. Constr.*, Nos. 95-2379, 96-1346, 1997 U.S. App. LEXIS 15440, at *6 (6th Cir. June 23, 1997) (citing *Behnke, Inc.*, 883 F.2d at 461 and *Robbins v. Lynch*, 836 F.2d 330 (7th Cir. 1988)); *Operating Engineers' Local 324 Fringe Ben. Funds v. Rieth-Riley Constr. Co.*, 681 F. Supp. 3d

746, 760–61 (E.D. Mich. 2023) (discussing how parties must mutually agree to be bound by an expired CBA for it to extend beyond its stated duration).

Once an employer enters into an applicable agreement, the Employee Retirement Income Security Act ("ERISA") ensures that the employer fulfills its obligations. Section 515 of ERISA provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. This obligation is "enforceable by plan trustees pursuant to ERISA's civil enforcement provisions at 29 U.S.C. § 1132[.]." *Trs. of the Operating Engineers' Local 324 Pension Fund v. Tri-City Groundbreakers, Inc*, No. 21-CV-11080, 2023 U.S. Dist. LEXIS 22221, at *12–13 (E.D. Mich. Feb. 9, 2023).

To show that an employer is not meeting its contribution obligations, plan trustees often rely on comprehensive audits. If an employer fails to maintain adequate records regarding its employees' work as required by ERISA, then the results of such an audit are presumptively accurate. *Mich. Laborers' Health Care Fund v. Grimaldi Concrete*, 30 F.3d 692, 696 (6th Cir. 1994); *see also Pace Indus. Union-Management Pension Fund v. Dannex Mfg. Co.*, 394 F. App'x 188, 197 (6th Cir. 2010); *Trs. of Detroit Carpenters Health & Welfare Fund v. River City Constr. Co.*, 99 F. App'x 612, 615 (6th Cir. 2004); *Trs. of the Painters Union Deposit Fund v. Ybarra Constr. Co.*, 113 F. App'x 664, 668 (6th Cir. 2004). In these circumstances, the burden shifts to the employer to rebut the audit's conclusions and the inferences that can be drawn from it. *Ybarra Constr. Co.*, 113 F. App'x at 668.

14

## IV.    CONCLUSIONS OF LAW

Applying the foregoing law to the Court's findings of fact, the Court reaches the following conclusions. *First*, H2OPruf was obligated to contribute to the Pension Fund through the end of 2019 pursuant to the terms of both the CBA dated July 1, 2017, through December 31, 2018, and the Participation Agreement because H2OPruf and Local No. 136A both manifested an intent to be bound by the CBA notwithstanding its expiration. *Second*, H2OPruf was obligated to contribute to the Pension Fund—but not the Education Fund—in accordance with the terms of the Participation Agreement in 2020 and 2021. *Third*, Plaintiffs have failed to show that H2OPruf owes delinquent contributions to either the Pension Fund or the Education Fund.

### A.    H2OPruf was obligated to contribute to the Pension Fund through the end of 2019 pursuant to the terms of both the CBA dated July 1, 2017, through December 31, 2018, and the Participation Agreement.

As noted in the Court's findings of fact above, H2OPruf and Local No. 136A agreed to extend the duration of the second CBA between them (Joint Ex. 7) until the third CBA (Joint Ex. 20) took effect. *See supra* Subsection II.B.1. In doing so, they obligated H2OPruf to continue contributing to the Pension Fund in accordance with the second CBA's terms for the entirety of 2019. *See Mich. Bricklayers*, 1997 U.S. App. LEXIS 15440, at *6 (holding that "[a]n expired, signed collective bargaining agreement…may continue to bind an employer" to its benefits contribution obligations, "if the employer demonstrates an intent to continue to be bound"). This had a secondary effect. The Participation Agreement between H2OPruf and the Pension Fund provides that it "shall remain in effect during the term of any CBA between the Employer and a Local Union and/or the International Union and during any extensions or renewals thereof[.]" [Joint Ex. 63 at 5]. Thus, by extending the duration of the second CBA until December 31, 2019, H2OPruf extended the duration of the Participation Agreement as well. [*See id.*]. Accordingly, the

Court concludes that H2OPruf was obligated to contribute to the Pension Fund in 2019 pursuant to the terms of both the CBA dated July 1, 2017, through December 31, 2018, and the Participation Agreement. H2OPruf, however, was not obligated to contribute to the Education Fund during this time as neither the CBA nor the Participation Agreement mention the Education Fund. *See* 29 U.S.C. § 186(c)(5) (noting that an employer may only contribute to an employee benefit fund if, among other things, "the detailed basis on which such payments are to be made is specified in a written agreement with the employer[.]"); [*see also* Joint Exs. 7, 63].

**B. H2OPruf was obligated to contribute to the Pension Fund—but not the Education Fund—in accordance with the terms of the Participation Agreement in 2020 and 2021.**

As the Court just noted, H2OPruf extended the duration of the Participation Agreement till December 31, 2019, when it and Local No. 136A extended the second CBA until they reached a new agreement. *See supra* Section IV.A. Because the third CBA took effect the next day (meaning there was no gap where H2OPruf was not covered by a CBA), the Participation Agreement continued to remain in effect until the third CBA, and by extension H2OPruf's relationship with Local No. 136A, terminated on December 31, 2021. [*See* Joint Ex. 20 at 19; Joint Ex. 63 at 5]. Accordingly, the Court concludes that—in addition to its 2020 and 2021 contribution obligations described in the Court's Summary Judgment Order [Doc. 84 at 13–15]—H2OPruf was obligated to contribute to the Pension Fund in accordance with the terms of the Participation Agreement from January 1, 2020, through December 31, 2021. The Court further concludes that the Participation Agreement does not obligate H2OPruf to contribute to the Education Fund on behalf of its non-represented employees during this time period because, again, the Participation Agreement does not mention the Education Fund. *See* 29 U.S.C. § 186(c)(5). This means that

16

H2OPruf was only obligated to contribute to the Education Fund on behalf of its represented employees in 2020 and 2021.

### C. The Trustees have failed to show that H2OPruf owes delinquent contributions to either the Pension Fund or the Education Fund.

Having established the scope of H2OPruf's contribution obligations, the Court now turns to whether it met those obligations. The Trustees argue that H2OPruf has not and point to their audit report as proof, a report that they maintain is entitled to a presumption of accuracy given H2OPruf's failure to maintain adequate records. [*See* Doc. 121 at 19–21]. The Court agrees that H2OPruf's recordkeeping was at times lacking. Whether these inadequacies trigger the presumption, however, is irrelevant because even assuming that the audit report is presumptively accurate, H2OPruf has overcome that presumption.

As the Court noted *supra* Subsection II.B.2, the audit report (including its revised calculations) is inherently flawed. It was prepared without reference to all the applicable CBAs (and with reference to at least one inapplicable CBA); it assesses H2OPruf for delinquent contributions that have no basis in any contract; and it seemingly fails to credit H2OPruf for the entirety of the contributions that it made. Given the number and magnitude of these errors, the Court concludes that H2OPruf has met its burden of rebutting the audit report's conclusions. *See Trs. of the Nw. Ohio Plumbers & Pipefitters Pension Plan v. Helm & Assocs.*, No. 3:10 CV 739, 2012 U.S. Dist. LEXIS 93446, at *17 (declining to treat as accurate an audit that contained "inherent flaws" and was thoroughly debunked at trial); *see also Local 282 Welfare Tr. Fund v. A. Morrison Trucking, Inc.*, CV-92-2076(JMA), 1993 U.S. Dist. LEXIS 4741, *3–10 (E.D.N.Y. Mar. 30, 1993) (declining to treat as accurate an audit premised on inaccurate assumptions).[19]

---

[19] The Second Circuit employs a materially similar burden-shifting framework to the Sixth Circuit regarding when a contribution delinquency audit must be presumed to be accurate. *See A. Morrison Trucking, Inc.*, 1993 U.S. Dist. LEXIS 4741, at *3–4.

17

Accordingly, and as noted in the Court's findings of fact, the Court does not afford the Trustees' audit report (or Gamboa's accompanying testimony) any meaningful weight. And without the audit report, the remaining evidence in the record fails to establish that H2OPruf owes the Funds any delinquent contributions.

At trial, the parties introduced the following records that directly speak to H2OPruf's contribution obligations: (i) hours worked reports for August 2016, January 2017, January 2018, January 2019, January 2020, and January 2021 [Joint Ex. 3]; (ii) summaries of H2OPruf's contributions on behalf of Wesley and Cathy Adams [Joint Exs. 4, 27, 31]; and (iii) monthly contribution reports for May 2021 through September 2021 [Joint Ex. 50]. Beyond these exhibits, the Trustees also introduced an incomplete copy of H2OPruf's 2019 payroll summary [Joint Ex. 51] and invoices from Tri-State Roofing regarding work Tri-State performed on H2OPruf's behalf. [Joint Ex. 57]. Assuming every hour identified in these exhibits was one for which H2OPruf was obligated to contribute (excluding the hours identified as paid in the Adams' contribution summaries [Joint Exs. 4, 27,31] but including any allegedly underreported hours [*see* Joint Ex. 63 at 5]), the evidence would show that H2OPruf was obligated to contribute to the Pension Fund (and later the Education Fund) for the following hours:[20]

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|------|------|------|------|------|------|------|-------|
| Hours | 3,563 | 1,582 | 1,290 | 24,596.47 | 1,237 | 8,063.6 | 40,332.07 |

Further assuming that H2OPruf should have contributed to the Pension Fund at the journeyman/Participation Agreement rate for each of these hours, H2OPruf would be obligated to contribute the following to the Pension Fund:

---

[20] In reaching these figures, the Court cross-referenced the hours listed in the various documents to ensure both that no hour was missed, and that no hour was accounted for more than once (e.g., if multiple documents showed that employee X worked 20 hours in May 2017, the Court only counted those 20 hours once).

18

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| Pension Fund Contribution Obligations | $3,563.00 | $1,582.00 | $1,290.00 | $24,596.47 | $1,546.25 | $12,095.40 | $44,673.12 |

And if the Court assumes that H2OPruf was obligated to contribute to the Education Fund for every employee aside from Cathy Adams, Wesley Adams, Jessica Goodman, and Terri Wells (who the parties agree were covered by only the Participation Agreement), then H2OPruf would be obligated to contribute the following to the Education Fund:

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| Education Fund Contribution Obligations | - | - | - | - | $56.28 | $327.10 | $383.38 |

Thus, generously construing the evidence in the Trustees' favor, H2OPruf would be obligated to contribute the following total amounts:

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| Total Contribution Obligations | $3,563.00 | $1,582.00 | $1,290.00 | $24,596.47 | $1,602.53 | $12,422.50 | $45,056.50 |

The Court has already found that H2OPruf contributed at least $86,769.50 to the Funds between 2016 and 2021. *See supra* Subsection II.B.2. Subtracting $20,920.00 from this amount to reflect the contributions already accounted for in the Adams' contribution summaries,[21] this means H2OPruf paid the Funds $65,849.50. This amount covers not only the contribution obligations

---

[21] This figure represents the $15,360.00 contributed on behalf of Cathy and Wesley Adams from 2016 through 2019 plus the additional $5,560.00 contributed on their behalf in 2020 and 2021. [Joint Exs. 4, 27,31].

19

described above but also any potential interest and/or liquidated damages that could result.[22] Accordingly, the evidence fails to establish that H2OPruf owes either the Pension Fund or the Education Fund any delinquent contributions.

## V.   CONCLUSION

The Trustees' belief that H2OPruf may not have properly contributed to the Pension and Education Funds over the years is, to an extent, understandable. The confusion surrounding H2OPruf's contribution obligations would lead any reasonable person to question whether every dollar had been accounted for. But a mere question is not enough to prevail on a claim. To do that, the Trustees were required to show that it was more likely than not that H2OPruf had failed to

---

[22] To illustrate this point, consider the following hypothetical. Assume that the outstanding obligations were due on the first date of their respective years (e.g., H2OPruf owed $3,563.00 on January 1, 2016). Now further assume that rather than pay the $65,849.50 in multiple checks throughout 2020 and 2021, H2OPruf paid this amount as one lump sum on December 31, 2021. Although neither of these assumptions reflect what actually happened in this case, they both have the effect of inflating H2OPruf's total obligations beyond what it could actually owe. As a result, if H2OPruf would meet its obligations under this inflated hypothetical, then it would necessarily have met its actual obligations. The Court uses this hypothetical to simply its calculations.

Applying the applicable interest rates and liquidated damages provisions to H2OPruf's contribution obligations in accordance with the assumptions above, H2OPruf would owe the following on December 31, 2021 [Joint Ex. 2 at 15; Joint Ex. 7 at 10; Joint Ex. 20 at 13–14; Joint Ex. 33 at 1, 31–32; Joint Exs. 34; 63]:

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|
| Total Contribution Obligations | $3,563.00 | $1,582.00 | $1,290.00 | $24,596.47 | $1,602.53 | $12,422.50 | $45,056.50 |
| Liquidated Damages | - | - | - | - | - | - | $4505.65 |
| Interest Rate | 72% | 60% | 48% | 36% | 24% | 12% | |
| Interest (Pension and Education) | $2,565.36 | $949.20 | $619.20 | $8,854.73 | $384.61 | $1,490.70 | $14,863.80 |
| Total | | | | | | | $64,425.95 |

Thus, even if the Court was to twist the evidence to maximize H2OPruf's outstanding contribution obligations, interest, and liquidated damages, H2OPruf would still only owe $64,425.95 excluding the contributions already accounted for by the contribution summaries. As the evidence at trial established that H2OPruf paid the Funds at least $65,849.50 excluding what is accounted for by the contribution summaries, it would have met its contribution obligations under the Court's hypothetical. And because this hypothetical inflates H2OPruf's obligations beyond what it would ever actually have to pay under the evidence presented, that H2OPruf would meet its obligations under this hypothetical means that it also necessarily met its actual obligations.

meet its contribution obligations. They attempted to meet this burden primarily through an audit, but their audit report was fundamentally flawed. It was based on one unknown contract and one which H2OPruf did not execute; it assessed contributions where none were required; and it failed to fully credit H2OPruf for the contribution that it made. The combination of these flaws left the audit report inherently unreliable, and the remaining evidence was insufficient to tip the scales in the Trustees' favor. Accordingly, the Trustees have failed to show that it is more likely than not that H2OPruf failed to meet its contribution obligations, and this matter must be **DISMISSED WITH PREJUDICE**.

H2OPruf's motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) is **DENIED AS MOOT**.

A separate judgment shall enter.

**SO ORDERED**.

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**

21